In the early part of the year 1948, the defendant, Mills Tooke Properties, Inc., a Louisiana corporation, of which Mr. Mills Tooke is president and general manager, drilled two producing oil wells in the southern part of Oil City in Caddo Parish, under lease from Henry C. Baldridge that embraced a lot on which Baldridge lived, containing approximately one-third of an acre. The record does not definitely disclose the date the wells "came in" as producers. They were not drilled simultaneously, but both were completed prior to the time of happening of the transactions which gave rise to this lawsuit.
In connection with each well there was excavated what is called a "slush pit", the dimensions of which are variously estimated. They were indispensable to drilling operations, and as the name indicates, contained slush needful to drilling.
Under a covenant in the mineral lease from Baldridge it became the duty of the lessee to refill these pits within a reasonable time after completion of wells.
While drilling operations were in progress the yard about the Baldridge home and the seventy-five foot (75') long road from the front (west) end thereof to the public highway, were badly cut and torn up from heavy vehicular traffic. However, the lease from Baldridge contains no agreement on the part of the lessee to repair such conditions.
In this suit the plaintiff seeks to recover judgment for $1,340.65, the alleged value of labor and services rendered and of materials furnished by him, allegedly at defendant's request, to fill said slush pits, repair the yard and road leading thereto, and to put them in such physical condition that they could be traveled upon by pedestrians and ordinary vehicles. It is alleged *Page 550 
that this work was done between February 15th and the following March 12, 1948, "for and in connection with the drilling and operation" of said two wells.
In conjunction with the suit, plaintiff procured the issuance of a writ of provisional seizure under which the lease, the wells, the tanks and various kinds of machinery on the lease were seized. It is asserted that because of the character of and place where the work was done and material furnished, plaintiff has a lien and privilege upon the seized property to secure payment of the alleged indebtedness.
Defendant denied emphatically that he, in any way or manner, authorized plaintiff to do the work and furnish the material for which he sues, and therefore, is not responsible for the cost thereof; and in all other respects the material allegations of the petition are articulately denied. A special defense is set up, but the conclusions reached by us on the merits of the case obviate here giving a summary thereof.
Defendant reconvened and alleged that the writ of provisional seizure illegally and wrongfully issued and prayed that it be dissolved with damages for these reasons, viz.:
That defendant does not owe the amount for which it is sued, because plaintiff was never authorized to do the work or furnish the material claimed by him; that such labor was not done nor was the material furnished "in connection with the drilling or in the operation" of the Baldridge wells; that said wells had been drilled, completed and were flowing oil prior to the said work being done and materials furnished.
Defendant, further, in the alternative, prays that plaintiff be condemned to pay it $100.00 as the fee of its counsel for services rendered, and to be rendered, in dissolution of the writ and for $250.00, representing other damages suffered by it on account of the illegal issuance and levy of said writ.
Plaintiff's demands were rejected at his cost. The writ of provisional seizure was dissolved and he was cast for $100.00, being the fee of defendant's counsel. Plaintiff appealed.
The primary question in the case has to do with the alleged contract between the parties. Plaintiff follows and is equipped to do oil field work such as he alleged was done in this instance. He has followed that line of work for several years. Until February 2, 1948, he never knew Mr. Tooke, but he testified that on that date he came to the site of the Baldridge wells in the hope of seeing a Mr. Thompson who then had business relations with Mr. Tooke, but who was not in his employ. He says he had been told that Thompson might authorize him to do the work and furnish the material herein involved. He says that at that time the wells were being drilled and that Mr. Tooke was there and someone pointed him out to the plaintiff; that Tooke was standing on the railroad right-of-way, some seventy-five (75') feet from the lease site; that he addressed Mr. Tooke by name and that Tooke without further ado, said: "If I owe you any money, let me pay you," to which plaintiff says he replied: "You do not owe me any amount, but I want you to owe me something." Following this testimony, plaintiff further testified as follows, to-wit: "And then I told him my business, and he said: 'Well, we have to do that all right,' and I said: 'How about doing it for you?' And Mr. Tooke said: 'Go ahead and see Mr. Baldridge about it and whatever he says do, go ahead and do it.' "
It is true that elsewhere in his testimony plaintiff states that Tooke instructed him at that time and place to go ahead with the work. This has the appearance of afterthought. We accept the above quoted testimony of the plaintiff as truly reflecting the conversation between the parties, if any actually occurred. Plaintiff added that at that time Mr. Tooke was in a hurry to get away and he admits that the matter of price for the work and materials was not mentioned.
Notwithstanding he testified that Tooke referred him to Mr. Baldridge for instructions as to the sort of work to be done, he admits that he never saw Baldridge nor *Page 551 
made any attempt to do so. Instead, within three or four days he began the work, although weather conditions for so doing were most unfavorable. Tooke positively denies that this conversation with plaintiff was had at the place and time mentioned or any other place or time. He denies that he was even on the lease site on February 2nd. It will be noted that it is alleged in the petition that this conversation occurred on February 15th.
Plaintiff's wife testified that she accompanied her husband to the wells on said date and saw him and Tooke in conversation, but she did not hear what was said by either.
According to plaintiff's own testimony he had no contract with the defendant to do the work and furnish the material mentioned. The extent and nature of the work he was to do, if any, was a matter left to Baldridge, and he did not consult Baldridge at all, And, since defendant was only obligated to Baldridge, under the lease, to fill the pits, it logically follows, at best, that he would not have done more than this toward repairing the lease site.
It is likely, though it is not made certain, that Tooke visited the wells while some phase of the work was being done. Plaintiff says he did, and seriously argues that because Tooke did not object or otherwise interfere with or protest against what he saw going on, he thereby recognized that the work was being done with his consent, and cannot now be heard to question the liability of his company for the cost of the work. This position is not necessarily sound.
It is argued by defendant, in opposition to the above, that one may accept benefits accruing to him from the acts of another who serves, without a contract or authority from the beneficiary; and not commit himself to financial liability to the other party in so acting. This is entirely possible as a matter of law.
The case of Price v. Foster et al., 182 La. 79, 161 So. 161, negatives plaintiff's above mentioned position. If there was no contract, the fact that when Mr. Tooke hurriedly visited the wells and noticed that some material was being delivered upon the seventy-five (75') foot roadway and/or upon the yard, the repair of which his company was under no obligation to do, certainly would not commit him to liability for the cost of the repairing.
In the Price case, supra, the court held that although the defendants knew the plaintiff had rendered valuable services to their father and to his estate, after his death, in the matter of adjusting a large claim by the Government for income taxes, and accepted the monetary benefits flowing from the services, as they had not agreed to pay him to render the service, he was without right to require them to pay him for such services either on contract or quantum meruit. The matter wholly turned upon the lack of any commitment on the part of these heirs to pay for the services rendered; that knowledge on their part did not constitute a contract or obligation to pay.
Plaintiff relies upon Act No. 68 of 1942 to sustain his contention that he has a lien and privilege upon the seized property to secure payment of his claim; and, this, too,whether the work was done or materials furnished under contractor not. This act creates a lien and privilege in favor or any person, firm, corporation, etc., who shall perform any labor or service, or who shall furnish any material or supplies "inconnection with the drilling of any well or wells in search ofoil, gas or water, or for or in connection with the operationof any oil, gas or water well," etc. The lien and privilege operates against the lease, the well or wells, the produced oil, tanks and all machinery etc. located upon the lease; and it secures payment of the amount due for such services and material and supplies furnished.
We are convinced from the testimony in the record that none of the work done or material delivered had any "connection" whatever with the drilling or operation of the well, because we are satisfied, as said before, the wells had been completed, the derricks removed and storage tanks erected before plaintiff began the work. When these things happen, it is an infallible sign that a well has been completed *Page 552 
as a producer. Also, we do not agree with the contention that the lien and privilege came into existence even though there was no contract between the parties.
Under the 1942 act the lien and privilege is designed to secure payment of "the amount due" for labor, etc., and since we have held that no amount was due to plaintiff, because there was no contract, express or implied, perforce, there was at no time any lien or privilege to enforce.
In passing, we only repeat a legal principle known to all, when we say that liens and privileges are stricti juris. They are in derogation of common rights and may not be extended by way of construction to cover situations not clearly intended to be comprehended by them.
Defendant did not tender the legality of the issuance of the writ of provisional seizure by independent motion. The motion was incorporated in its reconventional demand. Plaintiff timely objected to the introduction of any testimony to support the motion and reconventional demand on the ground that the pleading was improper in that the motion to dissolve should have been tendered in limine, tried and wholly disposed of before damages for its unlawful issuance could be asked in reconvention. The court overruled the objection and admitted the proffered testimony. We are of the opinion that the objection should have been sustained.
The right of a defendant to claim damages by way of reconvention, when he has caused a conservatory writ against him to be dissolved on any account, was created by Act No. 50 of 1886, which amends Article No. 375 of the Code of Practice. The amendment reads: "* * * and provided further, that in all cases of arrest, attachment, sequestration, provisional seizure and injunction the defendant may, in the same suit by reconventional demand, recover from the plaintiff the damages he may have sustained by the illegal resort to such writ."
While the amendment authorizes such a claim to be asserted by reconventional demand in the same suit, it does not authorize, expressly nor by implication, that the motion to dismiss be incorporated in the answer and be tried along with and as an incident of the reconventional demand. The act unquestionably intended, and the jurisprudence has so established, that the motion to dissolve be tendered, tried and disposed of in advance of trial on the merits, without mixing or mingling the issue or issues raised thereby with any other issues in the case. Of course, if the motion is sustained, when filed and tried in limine, the logical procedure then to follow is to assert the claim for damages by means of reconvention in the answer. The only question the motion tenders is that of legality or of illegality of the issuance of the writ.
Plaintiff cites and relies upon Younger Bros., Inc., v. Spell, 194 La. 16, 193 So. 354, 355. Counsel has evidently misconstrued the opinion in this case. The court did say, as we have said herein, that the right to claim damages in cases where conservatory writs have been dissolved should be set up by way of reconvention. It appears in the cited case that the defendant set up a claim for damages, in the motion to dismiss and no objection was raised as to the propriety of the procedure. The motion was tried, the writ dissolved and judgment awarded the defendant for a substantial amount. In the Supreme Court the plaintiff, appellant, filed what was denominated an exception of no cause of action wherein it was pleaded that the mover had no right to set up the reconventional demand for damages in the motion to dissolve and argued that the right to claim damages in such a case may only be asserted by way of reconventional demand in his answer. The Court, through its Chief Justice, said:
"If the plaintiff had objected in limine litis, to the defendant's setting up his reconventional demand for damages in his motion to dissolve the writ of provisional seizure, it is very likely that the objection would have prevailed. In article 377 of the Code of Practice it is declared that 'in all cases of reconvention' the defendant may set up his demand 'in his answer to the principal demand' or in a separate suit. Counsel for the defendant in this *Page 553 
case argue that the law in that respect was changed by Act No. 50 of 1886, amending article 375 of the Code of Practice, so as to allow the defendant in any case where a conservatory writ is issued against him to claim damages by way of a reconventional demand in the same suit if the writ was obtained wrongfully, even though the plaintiff and defendant reside in the same parish. But that amendment has nothing to do with article 377, prescribing the method for asserting a reconventional demand. There is good reason why a reconventional demand for damages for the alleged wrongful obtaining of a conservatory writ should not be allowed in a motion to dissolve the writ, but should be reserved until the defendant answers the suit. * * *"
"Besides, a motion to dissolve a conservatory writ is a summary proceeding; and a claim for damages, such as the defendant's reconventional demand in this case, is one which may be asserted only by the ordinary proceeding, and not by the summary proceeding, without the consent of the defendant in the proceeding. * * *"
The plaintiff cites the following cases from our jurisprudence, which clearly sustain his position with respect to the motion to dismiss and reconventional demand, to-wit: Dehan v. Youree et al., 166 La. 635, 117 So. 745; Fabacher v. Rouprich et al., 160 La. 433, 107 So. 295; Rains v. Jones et al., La. App., 152 So. 356; Hebert v. Hurwitz Mintz Furniture Company et al., La. App., 21 So.2d 638; Three Rivers Oil Company v. Laurence, 153 La. 224, 95 So. 652; Witbeck v. Rea et al., 158 La. 1003, 105 So. 43; Kavanaugh v. Frost-Johnson Lumber Company, 149 La. 972, 90 So. 275; Smith v. Wm. D. Keith Motor Company, 163 La. 395, 396, 111 So. 798.
It is unnecessary to consider or discuss and pass upon the other defenses raised.
For the reasons herein assigned, the judgment from which appealed is affirmed, excepting that part thereof which awards judgment of One Hundred ($100.00) Dollars in favor of the defendant, and to this extent said judgment is annulled, reversed and set aside. Plaintiff is cast for all costs except those incurred in the prosecution of this appeal, which shall be paid by the defendant.
KENNON, J., concurs.